# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | |
|---|---|
| W. TYNAN BROWN, | : |
| Plaintiff, | : |
| | : |
| v. | :     Case No. 3:06cv73 (PCD) |
| | : |
| MARK CATANIA, RICHARD | : |
| VIRCHOW, DENNIS WOESSNER and | : |
| CHRISTINA DAMBRA, | : |
| Defendants. | : |

## RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff W. Tynan Brown initiated this action pursuant to 42 U.S.C. § 1983, claiming

that Defendants subjected him to unreasonable force and an unreasonable search and seizure in

violation of the Fourth Amendment of the United States Constitution. Plaintiff also sets forth

state law claims of assault and battery, false imprisonment and intentional infliction of emotional

distress. Defendants now move, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure,

for summary judgment on all counts of Plaintiff's Complaint. For the reasons stated herein,

Defendants' Motion for Summary Judgment [Doc. No. 34] is **granted in part** and **denied in**

**part**.

## I.     BACKGROUND[1]

On or about November 14, 2004, Glastonbury Police Office Mark Catania was on duty

and conducting the nationally-recognized seatbelt enforcement campaign, "click it or ticket," on

Main Street in Glastonbury, Connecticut. At approximately 8:43 a.m., Officer Catania observed

Plaintiff operating a vehicle without wearing a seatbelt. Failure to wear a seatbelt while

---

[1]     The statement of facts that follows is derived primarily from Plaintiffs' Complaint and the parties'
Local Rule 56(a) statements. Except where noted, the facts as set forth herein are undisputed.

operating a motor vehicle in Connecticut is an "infraction." Conn. Gen. Stat. § 14-100a(c)(1) &

(4).[2]  Upon noticing that Plaintiff was not wearing his seatbelt, Officer Catania motioned him to

pull his car into the parking lot of the Glastonbury Volunteer Fire Department.  Plaintiff

complied and Officer Catania approached Plaintiff and asked him for his license and registration,

which Plaintiff provided.

After Plaintiff was stopped, Officer Catania heard him ask: "what about my

responsibilities that I have to do today," and "how many more people are going to have to die

while you're jerking around with this?" (Police Report 2, Defs.' Ex. A.)  Plaintiff, in his

deposition, denied making these comments. (Brown Dep. 45, 49, Aug. 2, 2006, Defs.' Ex. B.)

Plaintiff contends that when he was stopped, he was on his way to fax important documents to

"news media outlets" as a result of his involvement in a "highly covert operation." (Id. at 7;

Compl. ¶ 11.)  After turning over his license and registration and waiting for several minutes,

Plaintiff exited his vehicle, approached Officer Catania, and asked if he was under arrest.  Officer

Catania explained that he was in the process of completing Plaintiff's citation and apologized for

the delay.  Plaintiff returned to his car and waited an additional ten minutes.[3]  He then exited his

vehicle a second time, approached Officer Catania, and asked if he could walk home. (Brown

Dep. 15-16.)  In his police report, Officer Catania noted that Plaintiff ignored several requests to

"back up" and get back in his car. (Police Report 2.)  Plaintiff testified that Officer Catania gave

---

[2]     A violation of any provision of Connecticut General Statutes § 14-100a is an "infraction." Conn.
Gen. Stat. § 14-100a(c)(4).  This characterization excludes § 14-100a violations from the
definitions of "offense," "crime" and "violation."  Connecticut General Statutes § 53a-27 provides
that "an offense for which the only sentence authorized is a fine, is a violation unless expressly
designated an infraction."  The fine for a violation of Connecticut General Statutes § 14-100a(c)(1)
is fifteen dollars. Conn. Gen. Stat. § 14-100a(c)(4).

[3]     According to Plaintiff, he was detained for a total of twenty minutes.

Plaintiff "vague and ambiguous" instructions, telling him to "Get back in your car," "Sit on the hood of my car," and "Get in the back seat of my car," and that he could not comply with all three at once. (Brown Dep. 58-59.)

According to the police report, Officer Catania attempted to arrest Plaintiff, but Plaintiff tightened up both arms and clenched his fists to his chest. (Police Report 2.) Plaintiff denies this, contending that he could not have tightened his arms with his fists clenched to his chest because he was carrying a pack of Marlboro cigarettes, a cigarette lighter, car keys, a garage door opener and seven sheets of paper when he exited his vehicle. (Brown Dep. 18, 21.) Officer Catania, with the assistance of Glastonbury Police Officers Vetrano and Upton, brought Plaintiff to the ground and placed him in handcuffs. (Police Report 2.) Plaintiff contends that he did not physically resist Defendants, claiming that he was "attacked first." (Pl.'s Local Rule 56(a)(2) Statement ¶ 13; Brown Dep. 18-21.) Specifically, Plaintiff contends that when he approached Officer Catania the second time, Officer Catania grabbed Plaintiff's arm and pushed him. (Brown Dep. 18.) Plaintiff asserts that immediately after Officer Catania grabbed his arm, Officer Dambra jumped on Plaintiff's back, wrapped her legs around his waist and choked him, causing him to become semi-conscious. (Id. at 18-20.)

Plaintiff was arrested on charges of Interfering with a Police Officer, Conn. Gen. Stat. § 53a-167a,[4] and Failure to Wear Seatbelt, Conn. Gen. Stat. § 14-100a(c)(1). Officer Catania also found, pursuant to Conn. Gen. Stat. § 17a-503, that Plaintiff fit the requirements for an

---

[4] "A person is guilty of interfering with an officer when such person obstructs, resists, hinders or endangers any peace officer . . . in the performance of such peace officer's . . . duties." Conn. Gen. Stat. § 53a-167a(a). "Interfering with an officer is a class A misdemeanor." Id. § 53a-167a(b).

emergency committal and executed a "Police Emergency Examination Request" to that effect. (Police Emergency Examination Request, Defs.' Ex. A.)  In the emergency examination request, Officer Catania noted that Plaintiff "voiced thoughts of being executed and killing others," asked "how many other people have to die," and "made suicidal comments." (Id.)

Plaintiff was transported to Hartford Hospital in an ambulance.  Glastonbury Volunteer Ambulance personnel also took note of Plaintiff's mental state, writing that he had an "unorganized thought process, random and changing from subject to subject." (Ambulance Report 1, Ex. G.)  The ambulance personnel recorded Plaintiff's statement that "he belongs in the morgue and should just die," and noted that he was "cooperative throughout transport." (Id.)  Plaintiff was admitted to the Institute of Living at Hartford Hospital[5] on November 18, 2004 and discharged six days later, on November 24, 2004.  He was released without medication and with no diagnosis; the treating physician wrote that there had been "no opportunity to verify or disclaim" whether Plaintiff had a psychiatric disorder. (O'Connor Discharge Summary, Defs.' Ex. G.)  A probable cause hearing was held on November 24, 2004, and the presiding judge ordered Plaintiff's release. (Clark Discharge Summary, Defs.' Ex. G.)

Officer Catania confiscated Plaintiff's driver's license at the time of Plaintiff's arrest.  In light of Plaintiff's comments that he is "blind" in his right eye and on medication which causes him to fall asleep without notice, Officer Catania transmitted Plaintiff's license to the Department of Motor Vehicles ("DMV") so that Plaintiff's proficiency and physical ability to operate a motor vehicle could be tested. (See Police Report 2; Brown Dep. 47-49; DMV Form, Defs.' Ex. H.)  In order to regain his driver's license, the DMV directed Plaintiff to see certain

---

[5]     The Institute of Living is Hartford Hospital's Mental Health Network.

specialty doctors. In compliance therewith, Plaintiff went to a number of doctors who examined and approved him and sent their reports to the DMV. The DMV then scheduled Plaintiff for a road skills driving test. Plaintiff passed the test and his license was reissued on December 6, 2005. (See Brown Dep. 49-51.)

Plaintiff pled "no contest" or "nolo contendere" to the charges of "creating a public disturbance"[6] and "failure to wear seatbelt" and paid a fine of thirty-five dollars for each charge, for a total of seventy dollars. (Brown Dep. 41-42; Superior Court Transcript 2, Mar. 24, 2005, Defs.' Ex. D.)

Plaintiff contends that he suffered a physical injury during the incident, in that he became "semi-conscious" after one of the Defendant officers jumped on his back and forced him down on the ground. (Pl.'s Local Rule 56(a)(2) Statement ¶ 22; Brown Dep. 20.) Plaintiff has not sought treatment for any physical or mental injuries or illnesses and claims no present disabilities related to this incident. Plaintiff has no photos or medical records in support of any treatment related to any alleged physical injuries. Defendant Officers Virchow and Woessner did not arrive at the scene until after Plaintiff had been arrested and handcuffed.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). No genuine issue of material fact exists and summary

---

[6]    The charge of "interfering with a police officer" was reduced to the charge of "creating a public disturbance" in exchange for Plaintiff's no contest plea. (Brown Dep. 41-42.)

judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 69, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). A material fact is one which "might affect the outcome of the suit under the governing law" and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). Importantly, however, "[c]onclusory allegations will not suffice to create a genuine issue." Delaware & H. R. Co. v. Conrail, 902 F.2d 174, 178 (2d Cir. 1990).

The moving party bears the burden of establishing that summary judgment is appropriate, Anderson, 477 U.S. at 255, however, when moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant can satisfy its burden of establishing that there is no genuine issue of material fact in dispute by pointing to an absence of evidence to support an essential element of the non-moving party's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex, 477 U.S. at 324); see also Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("The moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The non-moving party, in order to defeat summary judgment, must then come forward with "sufficient evidence favoring the nonmoving party for a

jury to return a verdict for that party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In making this determination, the Court draws "all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." <u>Rodriguez v. City of N.Y.</u>, 72 F.3d 1051, 1060 (2d Cir. 1995) (citations omitted). However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading." Fed. R. Civ. P. 56(e).

Determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on a motion for summary judgment as such are within the sole province of the jury. <u>Hayes v. N.Y. City Dep't of Corr.</u>, 84 F.3d 614, 619 (2d Cir. 1996). "If reasonable minds could differ as to the import of the evidence . . . and if . . . there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." <u>R.B. Ventures, Ltd. v. Shane</u>, 112 F.3d 54, 59 (2d Cir. 1997) (internal citations omitted); <u>see also</u> <u>Matsushita</u>, 475 U.S. at 586 ("some metaphysical doubt as to the material facts" is insufficient for summary judgment); <u>Sologub v. City of New York</u>, 202 F.3d 175, 178 (2d Cir. 2000) ("When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury.").

## III.   DISCUSSION

### A.      Personal Involvement

The doctrine of respondeat superior does not apply to § 1983 actions and therefore, for Plaintiff to maintain a cause of action against the individual defendants, he must show that each

police officer was "personally involved in the alleged deprivation of his constitutional rights." Watson v. McGinnis, 964 F. Supp. 127, 130 (S.D.N.Y. 1997); accord Johnson v. Glick, 481 F.2d 1028, 1034 (2d Cir.), cert. denied, 414 U.S. 1033, 94 S. Ct. 462, 38 L. Ed. 2d 324 (1973) ("when monetary damages are sought under § 1983, the general doctrine of respondeat superior does not suffice and a showing of some personal responsibility of the defendant is required"). Plaintiff can show personal involvement by establishing that a defendant "directly participated in the infraction." Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986); Russo v. City of Hartford, 184 F. Supp. 2d 169, 185 (D. Conn. 2002); see also Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986) ("A plaintiff must thus allege a tangible connection between the acts of a defendant and the injuries suffered.").[7]

It is clear that Officers Catania and Dambra were personally involved, however, Defendants argue that there is no evidence that Officers Virchow and Woessner directly participated in Plaintiff's arrest. According to Defendant, neither Officer Virchow nor Officer Woessner was present at the time of Plaintiff's arrest. Plaintiff does not dispute this in his opposition brief, arguing only that the action should remain as to Defendants Catania and Dambra. Accordingly, summary judgment is granted on Plaintiff's § 1983 claims against Defendants Virchow and Woessner based on Plaintiff's failure to show that they were personally involved in the alleged deprivation of his constitutional rights.

**B.      False Arrest**

In analyzing a § 1983 claim of false arrest or false imprisonment, federal courts generally

---

[7]      Other grounds for personal liability exist where the defendant in question is a supervisory official, see Williams, 781 F.2d at 323-24; Russo, 184 F. Supp. 2d at 185, however, this is not alleged here.

look to the law of the state where the arrest occurred. Davis v. Rodriguez, 364 F.3d 424, 433 (2d Cir.2004) (examining Connecticut law to assess a plaintiff's false arrest claim).[8]  Defendant argues that Plaintiff must show, in order to maintain a § 1983 or state law claim of false arrest or false imprisonment, that the criminal proceedings at issue were terminated in his favor. Although this issue appears unsettled in Connecticut, the controlling Second Circuit case on the issue, Roesch v. Otarola, 980 F.2d 850 (2d Cir. 1992), held that "[a] person who thinks there is not even probable cause to believe he committed the crime with which he is charged must pursue the criminal case to an acquittal or an unqualified dismissal, or else waive his section 1983 claim." Id. at 853; see also Frey v. Maloney, No. 3:04cv1149 (MRK), 2007 U.S. Dist. LEXIS 16399, at *18 & n.3 (D. Conn. Mar. 7, 2007) (observing that both the Second Circuit and District of Connecticut courts have questioned Roesch's statement of Connecticut false arrest law, but nevertheless have not overturned and/or have followed Roesch); Weyant v. Okst, 101 F.3d 845, (2d Cir. 1996) (noting that "Connecticut law is less clearly settled" than New York law as to whether a favorable termination is required for a false arrest claim); Holman v. Cascio, 390 F. Supp. 2d 120, 125-26 (D. Conn. 2005) (noting courts that have questioned Roesch's holding). Absent controlling authority to the contrary, this Court will follow Roesch and require that a false arrest or false imprisonment plaintiff show that the prosecution arising out of the arrest at issue

---

[8]     The Second Circuit, applying Connecticut law, has noted that "the applicable law for false arrest and false imprisonment 'is identical.'" Russo v. City of Bridgeport, __ F.3d __, No. 95 4392, 2007 WL 603066, at *6, 2007 U.S. App. LEXIS 4428, at *17 (2d Cir. Feb. 27, 2007) (quoting Outlaw v. City of Meriden, 43 Conn. App. 387, 392, 682 A.2d 1112, 1115 (1996)); see also Roesch v. Otarola, 980 F.2d 850, 853-54 (2d Cir. 1992) ("The policy considerations that motivated the Court in Singleton are equally appropriate in the context of a section 1983 claim sounding in false imprisonment or false arrest."). In Connecticut, both false arrest and false imprisonment are defined as "the unlawful restraint by one person of the physical liberty of another." Outlaw, 43 Conn. App. at 392, 682 A.2d at 1115. Accordingly, the following discussion applies equally to Plaintiff's claim of false imprisonment as well as to any claim of false arrest.

terminated in his favor.[9]

As set forth above, Plaintiff entered a plea of *nolo contendere*, or "no contest," on both charges. (Brown Dep. 41-42; Superior Court Trans. 2, Mar. 24, 2005, Defs.' Ex. D.)[10]  As such, he is unable to claim the required favorable termination and therefore cannot maintain a § 1983 or state law claim for false arrest or false imprisonment. See Greene v. Wright, 389 F. Supp. 2d 416, 429 (D. Conn. 2005) (finding that a plea of *nolo contendere* is not a favorable termination as required for a § 1983 malicious prosecution claim); Marczeski v. Law, 122 F. Supp. 2d 315, 328 (D. Conn. 2000) (same).  Summary judgment shall enter for Defendants on Plaintiff's false arrest and false imprisonment claims.

### C.      Unreasonable Seizure

Plaintiff also claims that Defendants violated his Fourth Amendment right to be free from an unreasonable search[11] and seizure when they arrested him and transferred him to Hartford Hospital against his will.  It is well-established that an involuntary hospitalization can amount to a "seizure" under the Fourth Amendment, and as such, "the Fourth Amendment requires an official to have probable cause to believe that a person is dangerous to himself or others before he can seize and detain such person for a psychiatric evaluation." Glass v. Mayas, 984 F.2d 55,

---

[9]     This court's decision in Blalock v. Bender, No. 3:04cv1519 (PCD), 2006 U.S. Dist. LEXIS 39323, at *11-12 (D. Conn. June 1, 2006), should not be read to suggest otherwise.

[10]    The transcript of the Superior Court proceedings indicates that Plaintiff was advised, prior to entering his plea, that his *nolo contendere* plea could affect any claim he might wish to bring against the Glastonbury Police Department for civil rights violations. (Superior Court Trans. 3.)

[11]    In his Complaint, Plaintiff sets forth an unreasonable search and seizure claim against Defendants. (See Compl. ¶¶ 10-34.)  Plaintiff, however, fails to raise the unreasonable search claim in his brief and has provided no evidence in support of such a claim.  Accordingly, the Court considers the unreasonable search claim to be abandoned and will proceed only with the claim of an unreasonable seizure.

58 (2d Cir. 1993); accord Anthony v. City of New York, 339 F.3d 129, 137 (2d Cir. 2003);

Monday v. Oullette, 118 F.3d 1099, 1102 (6th Cir. 1997) ("The Fourth Amendment requires an

official seizing and detaining a person for a psychiatric evaluation to have probable cause to

believe that the person is dangerous to himself or others.").  Similarly, Connecticut law permits

involuntary hospitalization by a police officer upon a finding of both psychiatric disability and

dangerousness:

> Any police officer who has reasonable cause to believe that a person has psychiatric
> disabilities and is dangerous to himself or herself or others or gravely disabled, and
> in need of immediate care and treatment, may take such person into custody and take
> or cause such person to be taken to a general hospital for emergency examination
> under this section. The officer shall execute a written request for emergency
> examination detailing the circumstances under which the person was taken into
> custody, and such request shall be left with the facility. The person shall be examined
> within twenty-four hours and shall not be held for more than seventy-two hours
> unless committed under section 17a-502.

Conn. Gen. Stat. § 17a-503(a).

Probable cause in this context requires a police officer to have "reasonable grounds for

believing that the person seized is dangerous to himself or to others." Anthony v. City of New

York, 339 F.3d 129, 137 (2d Cir. 2003) (internal citation and quotation marks omitted). The

Fourth Amendment requires a "'probability or substantial chance' of dangerous behavior, not an

actual showing of such behavior." Waananen v. Barry, 343 F. Supp. 2d 161, 170-71 (D. Conn.

2004) (citation omitted); Monday v. Oullette, 118 F.3d 1099, 1102 (6th Cir. 1997); Hoffman v.

County of Delaware, 41 F. Supp. 2d 195, 209 (N.D.N.Y. 1999).  The quantum of evidence

necessary to establish probable cause must constitute "more than rumor, suspicion, or even

strong reason to suspect," United States v. Fisher, 702 F.2d 372, 375 (2d Cir. 1983), but "is

substantially less than that required for conviction," State v. Dennis, 189 Conn. 429, 431, 456

A.2d 333 (1983).

Even if probable cause was absent, Defendants, as public officials, will be protected by the doctrine of qualified immunity if the rights in question were not clearly established at the time of the performance of the conduct at issue; or, in the case of clearly established law, if it was objectively reasonable for Defendants to believe that their conduct did not violate those rights.[12] Qualified immunity, therefore, is a two-step inquiry. Courts first ask whether the conduct attributed to the officer violated a clearly established constitutional right or rights of which a reasonable person would have known.[13] Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001); Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). Even if it did, an officer is still entitled to qualified immunity if it was objectively reasonable for him to believe that his conduct did not violate those rights. See Anderson v. Creighton, 483 U.S. 635, 638-39, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987); X-Men Sec., Inc. v. Pataki, 196 F.3d 56, 65-66 (2d Cir. 1999). "To be deprived of the defense of qualified immunity, a public official must not simply violate plaintiff's rights; rather, the violation of plaintiff's rights must be so clear that no reasonable public official could have believed that his actions did not

---

[12] Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation," Mitchell v. Forsyth, 472 U.S. 511, 526, 86 L. Ed. 2d 411, 105 S. Ct. 2806 (1985), and as such, is appropriately raised and determined on summary judgment. See Saucier v. Katz, 533 U.S. 194, 200-201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001) ("Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive.").

[13] The Second Circuit has clearly established that individuals have a right to be free from involuntary hospitalization without probable cause. Hoyer v. DiCocco, 457 F. Supp. 2d 110, 117 (D. Conn. 2006); Glass, 984 F.2d at 58. Defendants do not argue that the right in question was not "clearly established," and therefore, the Court will limit its inquiry to the question of whether there was probable cause, and if not, whether it was objectively reasonable for Defendants to believe that their conduct did not violate Plaintiff's Fourth Amendment right to be free from an unreasonable search and seizure.

violate such rights." <u>Stanley v. Cooper</u>, 996 F. Supp. 316, 320-21 (S.D.N.Y. 1998); <u>see also</u>

<u>Birmingham v. Ogden</u>, 70 F. Supp. 2d 353, 375 (S.D.N.Y. 1999) ("where the law is clearly

settled, summary judgment may be granted on qualified immunity grounds if the only conclusion

a rational jury could reach is that reasonable officials would disagree about the legality of the

defendants conduct under the circumstances") (citation omitted).

The availability of qualified immunity in the context of an involuntary hospitalization

"turns on whether it was objectively reasonable for the defendants to believe, at the time they

examined [the plaintiff] and in light of the information that they possessed, that [the plaintiff]

was dangerous." <u>Glass</u>, 984 F.2d at 57; <u>see also</u> <u>Kerman v. City of New York</u>, 374 F.3d 93, 111

(2d Cir. 2004) (finding that it "was sufficiently clear in light of preexisting law that [the plaintiff]

had a right not to be detained or involuntarily hospitalized by an officer who . . . did not know,

and who patently ignored opportunities to determine, . . .whether he was dangerous to himself or

others"); <u>Perrelli v. Taylor</u>, No. 301 CV 1464, 2003 U.S. Dist. LEXIS 25602, 2003 WL

23648096 (D. Conn. Sept. 5, 2003) (finding that qualified immunity for involuntary

hospitalization based on Conn. Gen. Stat. § 17a-503(a) "hinges on whether it was objectively

reasonable for the Defendant to believe at the time of Plaintiff's hospitalization that Plaintiff

suffered from a psychiatric disability and was a danger to himself or society.").

Defendants argue that Officer Catania reasonably believed that Plaintiff's actions and

words, in connection with the documents he was carrying, supported the determination that there

was probable cause that Plaintiff had a psychiatric disability and was dangerous to himself and/or

others. (Defs.' Mem. Supp. 14.)  The police report indicates that when Officer Catania directed

Plaintiff to park his vehicle, Plaintiff asked "how many more people are going to die while your

[sic] jerking me around with this?" (Police Report 2.)  The report goes on to state that Plaintiff

was "mumbling and talking to himself about death and destruction" while Officer Catania was

writing the infraction. (Id.)  Plaintiff then exited his vehicle and attempted to walk home, at

which point Officer Catania arrested him. (Id.)  The Police Emergency Examination Request[14]

filled out by Officer Catania following Plaintiff's arrest indicates that Plaintiff "voiced thoughts

of being executed and killing others," asked "how many other people have to die," and made

"suicidal comments." (Police Emergency Examination Request.)

Officer Catania was not the only person to have observed this behavior.  The ambulance

personnel noted that Plaintiff demonstrated a "very unorganized thought process, random and

changing from subject to subject," "had multiple pictures of dead Vietnamese women in car,"

and stated that "he belongs in the morgue and should just die." (Ambulance Report 1.)  The

ambulance personnel also noted that Plaintiff "apparently voiced homicidal ideations to [the

police officers], but none to EMS." (Id.)  Upon arrival at the hospital, the examining physician

wrote that Plaintiff demonstrated "rapid, measured speech, tangential, circumstantial flight of

ideas, delusions—grandiose, paranoia," and noted that he was "irritable, restless, pacing," and

stated that "he belongs in a morgue."  Based on these findings, the examining physician prepared

a "Physician Emergency Certificate for no more than 15 days care and treatment for Psychiatric

Disabilities." (See Defs.' Ex. G.)

On the evidence presented, the Court finds that the circumstances were such that Officer

Catania had "reasonable grounds" and "strong reason to suspect" that Plaintiff suffered from a

---

[14]     Officers requesting an emergency examination pursuant to Conn. Gen. Stat. § 17a-503(a) are
required to complete this form and leave it with the examining facility.

psychiatric disability and was dangerous to himself and/or others, and therefore, under the Fourth Amendment, there was probable cause for his involuntary hospitalization. Even if probable cause was absent, however, Officer Catania would be entitled to qualified immunity. On the record established, it was objectively reasonable for Officer Catania to believe that Plaintiff was suffering from a psychiatric disability and was dangerous to himself and/or others, and that his conduct, in arresting Plaintiff and transferring him to Hartford Hospital, did not violate Plaintiff's Fourth Amendment rights. Compare Oullette, 118 F.3d at 1102 (granting summary judgment on Fourth Amendment claim where the defendant had probable cause to believe that the plaintiff was attempting to commit suicide, or at least might injure himself) and Bayne v. Provost, No. 1:04-CV-44, 2005 U.S. Dist. LEXIS 40889 (N.D.N.Y. Aug. 4, 2005) (granting summary judgment and finding probable cause to believe that the plaintiff presented a risk of suicide where the plaintiff's nurse had called 911 to report plaintiff's suicidal ideations and the plaintiff demonstrated a "clearly agitated mental state" and possessed numerous prescription medication, even in light of the plaintiff's denial of any suicidal ideations) with Hoyer, 457 F. Supp. 2d at 118 (denying summary judgment where it was "undisputed" that the plaintiff suffered from mental illness, but there was no evidence "to demonstrate that it was objectively reasonable for [the defendant] to believe that she was dangerous," as she had never "threatened to harm herself or anyone else").

The fact that Plaintiff was later released from Hartford Hospital without medication and with no diagnosis does not change the determination. See Waananen v. Barry, 343 F. Supp. 2d 161, 170-71 (D. Conn. 2004) (denying summary judgment and finding that the defendant officers had probable cause to hospitalize plaintiff where the information available to them at the time of

the incident indicated that plaintiff was potentially a harm to himself and his family, notwithstanding the fact that the Hartford Hospital evaluation concluded that the plaintiff was not a danger to himself or others).  Based on the facts available to Defendants at the time of Plaintiff's arrest—namely, his threats of suicide and homicidal ideations—there was probable cause to transfer him to Hartford Hospital for an emergency evaluation.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's § 1983 claim that they violated his Fourth Amendment right to be free from an unreasonable seizure.

> ### D.      Excessive Force

Plaintiff also claims that Defendants violated his Fourth Amendment rights by employing unreasonable force during his arrest.  The Fourth Amendment prohibits the use of excessive force during the seizure of a free citizen. See Graham v. Connor, 490 U.S. 386, 394, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989).  Accordingly, even when an officer has probable cause to seize an individual, the officer must employ a reasonable amount of force when effecting the seizure. See id. at 395.  "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," and therefore, the Court must carefully balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake" in order to determine "whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment." Id. at 396 (citing Terry v. Ohio, 392 U.S. 1, 22-27, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); quoting Tennessee v. Garner, 471 U.S. 1, 8, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985)); see also Bell v. Wolfish, 441 U.S. 520, 559, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979) ("The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical

application.").  Courts look at the "totality of the circumstances," <u>Garner</u>, 471 U.S. at 8-9, to

determine whether the force used during a seizure is reasonable, considering "the facts and

circumstances of each particular case, including the severity of the crime at issue, whether the

suspect poses an immediate threat to the safety of the officers or others, and whether he is

actively resisting arrest or attempting to evade arrest by flight." <u>Graham</u>, 490 U.S. at 396.  In

performing this analysis, the reasonableness of the force used should be considered "from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,"

and keeping in mind that "'[n]ot every push or shove, even if it may later seem unnecessary in

the peace of a judge's chambers,' violates the Fourth Amendment." <u>Id</u>. (quoting <u>Johnson v.

Glick</u>, 481 F.2d 1028, 1033 (2d Cir.), <u>cert. denied</u>, 414 U.S. 1033, 94 S. Ct. 462, 38 L. Ed. 2d

324 (1973)).  This inquiry is an objective one and should not take into account officers'

underlying motives or subjective intent. <u>See</u> <u>id</u>. at 397.

     As with Plaintiff's claim of an unreasonable seizure, the qualified immunity defense is

also available against his excessive force claim. <u>Finnegan v. Fountain</u>, 915 F.2d 817, 822-23 (2d

Cir. 1990).  The relevant question in this regard is whether "a reasonable officer could have

believed that the use of force alleged was objectively reasonable in light of the circumstances."

<u>Lennon v. Miller</u>, 66 F.3d 416, 425 (2d Cir. 1995).[15]  Defendants are entitled to qualified

immunity if "no rational jury could have found that the force used was so excessive that no

reasonable officer would have made the same choice." <u>Id</u>. at 426.

---

[15]    Defendants again do not argue that the right in question was not clearly established and therefore the Court will again assume that the right was clearly established and proceed to the analysis of whether it was "objectively reasonable" for Defendants to believe that their acts did not violate these rights.

Crediting Plaintiff's version of events for the purpose of summary judgment, there is a genuine dispute regarding the way in which Defendants arrested Plaintiff, whether and the degree to which he resisted, and the amount of force Defendants used to handcuff him. The facts show that Plaintiff was pulled over for failing to wear his seatbelt, emerged from his vehicle twice while Officer Catania was writing the infraction, and ultimately attempted to walk home. Officer Catania ordered him to stay, Plaintiff failed to comply, and Officer Catania attempted to arrest him. Defendants contend that Plaintiff "made physical contact" with Officer Catania and physically resisted arrest, prompting Officer Catania to seek assistance from two other police officers in order to place Plaintiff in handcuffs. (Defs.' Local Rule 56(a)(1) Statement ¶¶ 11-13.) Plaintiff, however, denies these assertions. (See Pl.'s Local Rule 56(a)(2) Statement ¶¶ 11-13.) According to Plaintiff, Officer Catania grabbed Plaintiff's arm and pushed him, at which point Officer Dambra jumped on Plaintiff's back, wrapped her legs around his waist and choked him, causing him to lose consciousness. (See Brown Dep. at 18-20.) These questions of fact are material to the reasonableness of the force used and the question of qualified immunity and therefore should be decided by a jury. See Breen v. Garrison, 169 F.3d 152, 153 (2d Cir. 1999) (reversing grant of qualified immunity on excessive force claim where facts were disputed as to allegations that defendant officer jumped on plaintiff's back, yanked his head and neck, pushed his face into a table, intentionally tightened his handcuffs, and hit him); Calamia v. City of New York, 879 F.2d 1025, 1035 (2d Cir. 1989) (qualified immunity on excessive force claim was jury question, where officer shoved plaintiff to floor, handcuffs were unduly tight, and plaintiff was left in uncomfortable position for several hours); Robison v. Via, 821 F.2d 913, 923-24 (2d Cir. 1987) (summary judgment inappropriate where parties disputed material facts regarding

plaintiff's allegations that she was pushed against car, yanked out, thrown against fender, and had arm twisted behind her back); Universal Calvary Church v. City of New York, No. 96 Civ. 4606 (RPP), 2000 U.S. Dist. LEXIS 15153, at *15-16 (S.D.N.Y. Oct. 17, 2000) (denying summary judgment where the parties disputed plaintiff's allegations that defendant officers assaulted him by pushing, hitting, striking, grabbing, dragging and choking him with a nightstick); Kerman v. City of New York, No. 96 Civ. 7865 (LMM), 1999 U.S. Dist. LEXIS 10870, at *25 (S.D.N.Y. July 19, 1999) (denying summary judgment where there were material issues of fact as to whether and to what extent the plaintiff continued to resist even after he realized that defendants were police officers, whether his handcuffs were intentionally tightened, and whether it was necessary to put him in the restraint bag with his hands cuffed behind him), aff'd in part and rev'd in part, Kerman v. City of New York, 261 F.3d 229, 239-40 (2d Cir. 2001) (jury should decide whether force used was excessive and whether defendant was entitled to qualified immunity where there were disputed factual issues as to defendant's conduct following the initial seizure and handcuffing). Although Plaintiff has not alleged that he suffered serious injury as a result of Defendants' actions, this fact is not fatal to his claim. See Robison, 821 F.2d at 924 ("If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe."). Accordingly, summary judgment is denied as to Defendants Catania and Dambra on Plaintiff's excessive force claim.

### E.    Intentional Infliction of Emotional Distress

To prevail on his claim of intentional infliction of emotional distress, Plaintiff must establish: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was

19

extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." Appleton v. Board of Educ., 254 Conn. 205, 210, 757 A.2d 1059 (2000) (quoting Petyan v. Ellis, 200 Conn. 243, 253, 510 A.2d 1337 (1986)). An intentional infliction of emotional distress claim requires conduct that exceeds "all bounds usually tolerated by decent society . . . ." Petyan, 200 Conn. at 254 n.5 (quoting W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 12, p. 60). The Restatement of Torts, adopted by the Connecticut Supreme Court in Appleton, provides that:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Restatement (Second) of Torts § 46 cmt. d (1965); see Appleton, 254 Conn. at 210-11. A defendant's conduct that is "merely insulting or displays bad manners or results in hurt feelings" is insufficient to form the basis of an intentional infliction of emotional distress claim. Appleton, 254 Conn. at 211 (quoting Mellaly v. Eastman Kodak Co., 42 Conn. Supp. 17, 19, 597 A.2d 846 (1991)).

Defendants argue that Plaintiff cannot succeed on any prong of the intentional infliction of emotional distress analysis, asserting that he has not shown that Defendants intended to cause harm, that their conduct was extreme and outrageous, that their actions caused Plaintiff's emotional distress, or that Plaintiff sustained severe emotional distress. Summary judgment is

granted for Defendants Virchow and Woessner because Plaintiff has offered no evidence of these defendants taking any action against him. See <u>Universal Calvary Church</u>, 2000 U.S. Dist. LEXIS 15153 at *46. As to Defendants Catania and Dambra, however, the Court disagrees with Defendants' argument. There are disputed issues of material fact as to the degree of force used, the necessity of the use of the force, and whether the force used was excessive. Courts considering this issue have held that use of excessive force in effecting an arrest can state a claim for intentional infliction of emotional distress. See <u>Orellana v. Sencio</u>, No. 3:04cv843 (JBA), 2006 U.S. Dist. LEXIS 61326, at *10-11 (D. Conn. Aug. 29, 2006) (holding that summary judgment on intentional infliction of emotional distress claim should be denied where plaintiff alleged that the police used excessive force when arresting him); <u>Birdsall v. City of Hartford</u>, 249 F. Supp. 2d 163, 175 (D. Conn. 2003) (denying summary judgment on intentional infliction of emotional distress claim where plaintiff alleged that police pushed him over kitchen food preparation table and hit him repeatedly with flashlight causing injury to lip and face as well as loosened teeth); <u>McKelvie v. Cooper</u>, 190 F.3d 58, 63 (2d Cir. 1999) (where there were genuine issues of material fact surrounding the police officers' search and detention of bar patrons, the question of whether the conduct was sufficiently extreme and outrageous to establish a claim for intentional infliction of emotional distress under Connecticut law was a question for the jury). Because the Court has found material issues of fact with regard to Plaintiff's excessive force claim, summary judgment is also improper on Plaintiff's intentional infliction of emotional distress claim.[16]

---

[16] The fact that Plaintiff did not seek medical treatment does not preclude a finding that he suffered from severe emotional distress. Under Connecticut law, the fact that a plaintiff does not seek medical treatment will not, on its own, bar a claim for intentional infliction of emotional distress.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. No. 34] is **granted in part** and **denied in part**.  Summary judgment is granted on Plaintiff's claim that he was subjected to an unreasonable search and seizure in violation of the Fourth Amendment, his claim of false arrest and/or imprisonment, and on Plaintiff's claims against Defendants Virchow and Woessner.  Summary judgment is denied, however, on Plaintiff's excessive force claim and his state law claims of assault and battery and intentional infliction of emotional distress against Defendants Catania and Dambra.

SO ORDERED.

Dated at New Haven, Connecticut, March  20 , 2007.

_____
/s/
Peter C. Dorsey, U.S. District Judge
United States District Court

_____

Birdsall, 249 F. Supp. 2d at 175.